355 F.2d 718
 Reginald A. HAWKINS, on behalf of himself and others similarly situated, Appellant,
v.
NORTH CAROLINA DENTAL SOCIETY, an unincorporated association, and its officers, W. B. Sherrod, President, L. Franklin Bumgardner, Vice-President, Luther Butler, President-elect, and S. B. Towler, Secretary-Treasurer, Second District Dental Society, Component of the North Carolina Dental Society, an unincorporated association and its officers, William F. Yelton, President, James A. Harrell, President-elect, Fleming H. Stone, Vice-President, O. J. Freund, Editor, and James E. Graham, Secretary-Treasurer, Appellees.
 No. 9612.
 United States Court of Appeals Fourth Circuit.
 Argued January 12, 1965.
 Decided January 20, 1966.
 
 Jack Greenberg, New York City (Frank H. Heffron, New York City, and Thomas H. Wyche, Charlotte, N. C., on brief), for appellant.
 William T. Joyner, Raleigh, N. C. (R. C. Howison, Jr., and Joyner & Howison, Raleigh, N. C., on brief), for appellees.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN and BRYAN, Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 We conclude that the record requires findings that the North Carolina Dental Society's exclusion of this Negro dentist from its membership was state action within the prohibitions of the Fourteenth Amendment and that it was a discriminatory denial to him of the equal protection of the laws.
 
 
 2
 The plaintiff, a practicing dentist, licensed by the State of North Carolina, sought admission to the North Carolina Dental Society and its regional component, the Second District Dental Society, membership in the latter being a prerequisite to membership in the former. There is presently no Negro member of those societies, and the plaintiff was unable to obtain the recommendations of two white dentist members. Without such recommendations, his application was not even eligible for consideration. Feeling that his exclusion was a discrimination because of his race, he then brought this class action for injunctive relief. We find that he was entitled to it.
 
 
 3
 The District Court grappled with the problem earnestly, but it did so in terms of the statutes as they appeared at the time of trial. Focus of attention there, however, deprives the statutes of the strong coloration which post-litigation history provides. The District Court was able to find, quite correctly, that, at the time of trial, in theory, any licensed dentist could be elected as a member of the Board of Dental Examiners or appointed by the Governor as the dental member of the Medical Care Commission or the Mental Health Council. Other activities of the Society in aid of the State's dental school and its research efforts, of adequate dental care in state mental hospitals and other institutions, and of appropriate fee schedules for dental services in State-sponsored programs were found to be "voluntary" and, of course, not state action. The District Court thus concluded that the Society's activities were private and not subject to the limitations of the Fourteenth Amendment.[1]
 
 
 4
 We think we should start at the beginning.
 
 
 5
 When the plaintiff sought admission to membership in the Society and when this action was begun, the statutes required that the six members of North Carolina's Board of Dental Examiners be elected by the Society.[2] Then, one member of the North Carolina Medical Care Commission was required to be the nominee of the Society,[3] while a representative of the Society had to be a member of the Mental Health Council.[4] There were also, the "voluntary" programs in aid of the state's dental school, hospital accreditation, dental care in state institutions and the promulgation of fee schedules for use by the state's industrial commission.
 
 
 6
 The Society had federal, as well as state, recognition, for the Veterans Administration required the Society's approval of applications by dentists to participate in the Administration's program.
 
 
 7
 When the Society declined consideration of the plaintiff's application for admission, therefore, and when this action was commenced, the state's statutes empowered the Society to name the six members of the North Carolina Board of Dental Examiners. They did much more. The dental member of the state's Medical Care Commission was required to be the nominee of the Society, and one member of the state's Mental Health Council was required to be a member of the Society. The other statutory recognition of the Society may be relegated to a back seat for the moment, for the ones upon which we now concentrate clearly authorized the Society to influence, if not to control, state functions.
 
 
 8
 The Board of Dental Examiners, the Medical Care Commission and the Mental Health Council are creatures of the State of North Carolina. The functions they serve are concededly public functions of the state. The questions at the time this action was commenced, therefore, were whether or not, the Society's exercise of its statutory powers to nominate and elect state officers[5] was state action, and, if so, whether or not its control of its membership, in the light of the additional requirement that another state officer[6] be a member of the Society, was also state action. The answers to these questions seem plain to us, but before we elaborate them we should refer to subsequent developments to put them in context.
 
 
 9
 After this controversy arose, § 90-22, N.C.Gen.Stat., was amended to delete the provision that the Dental Society name the members of the Board of Dental Examiners. Instead those members of the Board of Examiners who were not candidates to succeed themselves in that election were constituted a Board of Elections. Any licensed North Carolina dentist can now be nominated for election as a member of the Board of Examiners by a written petition signed by not less than ten licensed dentists and filed with the Board of Elections. The Board of Elections then prepares printed ballots containing the names of all nominees, one of which is mailed to each licensed dentist in the state, the eligible voters.
 
 
 10
 While the amendment of § 90-22 eliminated the role of the Society as such in the process of election of examiners and made it theoretically possible for a licensed, nonmember dentist to become a member of the Board of Examiners, there has been no substantial change in practical results. In the three elections held subsequent to the amendment there were three nominees for the two vacancies in the first one, but only two for the two vacancies in the second and third. In each of the latter two instances, the two nominees were declared elected without the formality of an election. All seven nominees in the three elections were members of the Society. At the time of the trial, all six Examiners were members of the Society, of course, and five of the six had been members of the Board prior to the amendment of § 90-22.[7]
 
 
 11
 In 1963, § 131-117 was amended to eliminate the provision that the dental member of the North Carolina Medical Care Commission was to be nominated by the Society. The amendment provided, instead, that the dental member of the Commission should be appointed by the Governor after requesting recommendations from the Society's president. At the same time, § 122-105 relating to the Mental Health Council was similarly amended. The amendments were sponsored by the Society.
 
 
 12
 At the oral argument in this Court, when reference was made to the fact that §§ 122-105 and 131-117, after the 1963 amendments, still contained explicit recognition of the Society's role in the nominating process, its attorney stated that if those provisions made the Society's conduct "state action," they could easily be eliminated when North Carolina's legislature met "next month." He was true to his word, and amendments were adopted deleting the requirements that the Governor solicit the recommendations of the Society's president when appointing the dental members of the Commission and the Council.
 
 
 13
 From the foregoing, it clearly appears that effective control of the practice of dentistry in North Carolina is in the Society. With respect to dentistry, the legislature leans heavily upon the Society. Its recommendations as to legislation are accepted, and embarrassing legislative recognition of its authority readily eliminated at its request. At the same time, while the statutes have undergone formal change at the Society's behest, there is no evidence of any change in its practical power to control the selection of the dental members of North Carolina's Boards, Commissions and Councils. The history of the three elections to the Board of Examiners following the amendment of § 90-22 demonstrates continuing control of the elective processes in the Society's inner clique.
 
 
 14
 The conclusion is inescapable that, when this action was begun, the Dental Society was performing important functions of the State. Exercise of its statutory powers to elect and nominate members of state boards and commissions was clearly state action. A similar conclusion has been reached with respect to a dental association whose powers were more indirect.[8] An organization vested by statute with the power to control, or even to substantially influence, the selection of state officers functions as an arm of the state.[9]
 
 
 15
 Under the circumstances of this case, the subsequent watering down of the statutes cannot alter the result. What has happened here is closely in parallel to earlier attempts to divorce party primaries from the state for the purpose of avoiding barriers to the exclusion of Negroes. After the Supreme Court held that Negroes could not be excluded from participation in Democratic Party primaries in Texas,[10] the statute was amended to delegate to the executive committees of the parties the power to prescribe qualifications for participation in the primaries. Party exclusion of Negroes under the amended statute was held to be unconstitutional, for the delegation of the power to discriminate was the substantial equivalent of its earlier statutory requirement.[11] Thereafter, it was held that exclusion of Negroes from primaries by a resolution adopted by the Texas Democratic Convention, without statutory authority, was not impermissible,[12] but nine years later the Supreme Court reversed itself and overruled Grovey v. Townsend.[13] It was then that South Carolina tried the expedient of repealing all of its laws relating to primaries. That was held by this Court to be unavailing, and Democratic Party exclusion of Negroes from its primaries, then the only meaningful elections in that state, was declared unconstitutional.[14] Later the constitutional requirement was extended to racially exclusive clubs in which the Democratic Party had vested control of its primaries.[15]
 
 
 16
 The rule enunciated by this Court in Rice and Baskin was subsequently confirmed and extended by the Supreme Court.[16] There, the Jaybird Democratic Association, which, without statutory authority, held preliminary elections in Texas, which, in practice, determined the results of the ensuing Democratic Party primaries, was held subject to the constitutional prohibition of discrimination. Though the separation of the Jaybird Association from the state "could scarcely have been more complete,"[17] its exercise of its practical power to control or influence the election of state officers, in light of the purpose and effect of its organization, was enough to bring its conduct within the constitutional requirements.
 
 
 17
 The post-litigation statutory changes procured by the Society in an effort to insulate its conduct can be held no less unsuccessful than the similar changes procured by the Democratic Parties of Texas and South Carolina for a similar purpose.
 
 
 18
 Here the Dental Society appears to be functioning clearly as the agent of the state in the selection of the dental members of the state's boards and commissions. Our conclusion is not dependent, however, upon a finding of fact to that effect. It is enough that North Carolina in some of its manifestations has involved itself in the Society's activities,[18] and that the Society's exercise of its powers of practical control or significant influence in the selection of state officials is a public function performed under the general aegis of the state.[19] While the form in which the Society's powers are exercised has been changed, the continued existence of those powers and their exercise in their altered form requires the conclusion that the statutory changes have not withdrawn the Society's activities from the realm of state action.
 
 
 19
 This is not to say that the activities of every organization which, because of the foresight of its leadership or the industry or identity of its members, influences public action are, themselves, state action. The line is necessarily imprecise,[20] and "[recognition of] the true boundaries between the individual and the community is the highest problem that thoughtful consideration of human society has to solve."[21] When, as a practical matter, however, there is continued exercise of powers initially derived from, and sanctioned by, statutes and touching so crucial an area as the selection of state officials, we entertain no doubt about the answer.[22]
 
 
 20
 The activities of the Society being "state action", its practice of racial exclusivity is patently unconstitutional. Only as a member of the Society, can a professionally qualified, licensed dentist have a voice in the election and appointment of dentists to those offices of the state which must be filled by dentists. The equal protection clause of the Fourteenth Amendment requires that he be not deprived, because of his race, of that equal right to participate in the public affairs of the state.
 
 
 21
 Since membership in the appropriate regional society is a prerequisite to membership in the state Society, the admission practices of the regional societies are subject to the same constitutional standards.
 
 
 22
 That the Dental Society in its admission practices has discriminated against Negroes is also clear. There were, at the time of the trial, 1,529 licensed dentists in North Carolina, of whom 90 to 100 were Negroes. There were 1,214 members of the Society, of whom not one was a Negro. Several Negro dentists had sought membership in the Society, none successfully.
 
 
 23
 The plaintiff, himself, is a graduate of the Howard University Dental School. He served a period of active duty as a commissioned dental officer in the Army. Licensed by North Carolina, of course, he has been a practicing dentist in that state for fifteen years. His application was not even considered, however, for he could not obtain the endorsements of two of the white members of the Society. Under the circumstances, when the Society's membership was racially exclusive and the recommendation of no Negro acceptable, rigid enforcement of the requirement of endorsements by members of the Society is itself a discrimination because of race. This has been the uniform conclusion of the courts in similar circumstances,[23] for, though use of such a rule in other contexts may be both reasonable and proper, applied to exclude Negroes, when no Negro, whatever his professional qualifications, can expect to receive the endorsements of the white members, it is racially discriminatory.
 
 
 24
 For these reasons we conclude that the Society's activities have the character of state action and that its racially exclusive membership practices contravene the Fourteenth Amendment. Since the plaintiff was entitled to relief, the judgment below will be reversed and the case remanded for further proceedings not inconsistent with this opinion.
 
 
 25
 Reversed.
 
 
 
 Notes:
 
 
 [1]
 Hawkins v. North Carolina Dental Society, W.D.N.C., 230 F.Supp. 805
 
 
 [2]
 N.C.Gen.Stat. § 90-22 (1958)
 
 
 [3]
 N.C.Gen.Stat. § 131-117 (1958)
 
 
 [4]
 N.C.Gen.Stat. § 122-105 (1958)
 
 
 [5]
 The dental member of the Medical Care Commission and the Dental Examiners
 
 
 [6]
 The dental member of Mental Health Council
 
 
 [7]
 N.C.Gen.Stat. § 90-22, incidentally, is the section which contains the legislative declaration that the practice of dentistry affects the public health, safety and welfare and must be controlled and regulated in the public interest and restricted to qualified persons. Statutory provision for a Board of Examiners was the first step in the regulatory scheme and its primary purpose. The Board is clearly one of the state serving a public, regulatory function of the State
 
 
 [8]
 Bell v. Georgia Dental Ass'n, N.D.Ga., 231 F.Supp. 299; See also Wilson v. Thompson, 83 N.J.L. 57, 60, 83 A. 502, 504
 
 
 [9]
 Nixon v. Herndon, 273 U.S. 536, 47 S. Ct. 446, 71 L.Ed. 759, and see its successors, cited below, coping with attempts at avoidance by indirection
 
 
 [10]
 Nixon v. Herndon, 273 U.S. 536, 47 S. Ct. 446, 71 L.Ed. 759
 
 
 [11]
 Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458
 
 
 [12]
 Grovey v. Townsend, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292, 97 A.L.R. 680
 
 
 [13]
 Smith v. Allwright, 321 U.S. 649, 64 S. Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110
 
 
 [14]
 Rice v. Elmore, 4 Cir., 165 F.2d 387
 
 
 [15]
 Baskin v. Brown, 4 Cir., 174 F.2d 391
 
 
 [16]
 Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152
 
 
 [17]
 Lewis, The Meaning of State Action, 60 Colum.L.Rev. 1083, 1092
 
 
 [18]
 Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L. Ed.2d 45
 
 
 [19]
 See, Simkins v. Moses H. Cone Memorial Hosp., 4 Cir., 323 F.2d 959, 966
 
 
 [20]
 Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45
 
 
 [21]
 Freund, Individual and Commonwealth in the Thought of Mr. Justice Jackson, 8 Stan.L.Rev. 9 (1955), quoting Jellinek, The Declaration of the Rights of Man and of Citizens 98 (1901) (quoted in Lewis, The Meaning of State Action, 60 Colum. L.Rev. 1083, 1122)
 
 
 [22]
 Evans v. Newton, 86 S.Ct. 486 (decided January 17, 1966, since the preparation of this opinion) lends additional support to our conclusion
 
 
 [23]
 Meridith v. Fair, 5 Cir., 298 F.2d 696; Hunt v. Arnold, N.D.Ga., 172 F.Supp. 847, 856. See also, United States v. Ward, W.D.La., 222 F.Supp. 617; United States v. Manning, W.D.La., 205 F.Supp. 172